IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL HEMPEN,<br><br>  Plaintiff,<br><br>v.<br><br>CITY OF NASHVILLE, ILLINOIS,<br><br>  Defendant. | Case No. 3:22-CV-3133-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In January 2021, Defendant City of Nashville, Illinois ("the City") fired Plaintiff Michael Hempen ("Hempen") from his job as a Utility Worker in its Water Plant. With this action, Hempen claims the City violated the Family Medical Leave Act ("FMLA") when it failed to notify him of his right to FMLA leave (Count I) and when it fired him for using FMLA-qualified leave for his chronic serious medical condition (Count II).

Now before the Court is the City's Motion for Summary Judgment. (Doc. 37). The City argues that it is entitled to judgment as a matter of law on Hempen's claim of FMLA interference in Count I because Hempen did not have a serious medical condition as defined by the FMLA, and he never provided notice of his intent to take leave. The City further argues that summary judgment should be granted as to Hempen's FMLA discrimination claim in Count II because it had legitimate, non-discriminatory reasons for Hempen's termination. For the following reasons, the City's motion is granted in part and denied in part.

## BACKGROUND

Hempen first began experiencing episodes of dizziness, nausea, and vertigo in or

around 2008 after being hit in the head with a sledgehammer in a work incident, resulting in a concussion. (Doc. 37-10 at p. 5). Over the next several years, Hempen saw multiple doctors for his symptoms. In November 2010, Hempen was taken to Washington County Hospital and then transferred to Belleville Memorial Hospital after an episode of severe dizziness, nausea, and fainting. (Doc. 40-3 at pp. 133-138). In February 2012, Hempen was seen by Dr. Jennifer Grana for complaints of severe vertigo and ringing in his ear, describing his hours-long episodes as "devastating." (Doc. 40-3 at pp. 42-47, 163). Hempen told the doctor that when an episode occurs, he has to lie down and cannot get up for an hour or two. (*Id.* at p. 163).

In March 2013, Dr. Ketan Shah diagnosed Hempen with Benign Paroxysmal Positional Vertigo. (*Id.* at 190). Later that same year, Hempen saw a neurologist, Dr. Jafar Kafaie, who told him there was no way to treat his vertigo other than staying in a dark room, covering his head, and remaining motionless until the episode went away. (Doc. 39-1 at p. 5). Hempen's vertigo episodes typically last from a few hours up to a day and a half. (*Id.* at p. 7).

On June 21, 2016, the City of Nashville hired Hempen as a Utility Worker assigned to the Water Plant. (Doc. 37-1). Within six to eight months after starting his job, Hempen felt a vertigo episode coming on while at work. (Doc. 39-1 at p. 8). Hempen was the only employee on duty at the Water Plant, so he called James Leonard, the Chief Operator at the time, and asked Leonard to finish his shift so he could go home. (*Id.*). Hempen's wife, Shari, picked him up from work and apologized to Leonard for Hempen vomiting in the trash can. (Doc. 39-7 at p. 2). She also explained Hempen's vertigo diagnosis to Leonard. (*Id.*).

In February 2019, Hempen, Leonard, and Blaine Middleton, the Utility Superintendent, attended a work conference in Effingham, Illinois. (Doc. 39-10 at p. 4). The

three men were at dinner when Hempen suddenly said he felt ill and needed to go back to his hotel room. (Doc. 39-2 at p. 10). A couple of days later, Middleton asked Hempen how he was doing. (Doc. 39-5). Hempen told him he has chronic positional vertigo, and Middleton asked if he had seen a doctor about it. (*Id.*). Hempen told Middleton that he had seen many doctors, that a neurosurgeon told him the vertigo would come and go, and that it was something he would have to deal with. (*Id.*). Middleton suggested that Hempen see a doctor again. (*Id.*).

In 2020, Hempen had to leave work at least three times because of dizziness caused by vertigo. (Doc. 39-5 at p. 3). Then, on November 19, 2020, Hempen had a severe episode at work. (Doc. 39-1 at p. 11). Hempen called his co-worker, Josh Beckner, and asked him to come in early so Hempen could go home. (*Id.*). He also called his wife, Shari, and asked her to pick him up. (*Id.*). When Shari arrived, Hempen was sitting on a rolling chair holding a trash can. (Doc. 39-7 at p. 4). Hempen told Shari he could not make it out to their truck, so she pushed him into the break room and helped him to lie down on the table. (*Id.*). They sat in the break room for close to two hours with the lights off before Hempen felt like he could get up and make it to their vehicle. (*Id.*). Beckner notified Leonard that Hempen was sick and had to go home. (Doc. 39-2 at p. 11).

Several days later, Middleton told Hempen he had heard about the incident. (Doc. 39-5 at p. 2). Hempen told him that it had been a bad episode, and Middleton urged him to see a doctor to get checked out. (*Id.*). Hempen made an appointment and was examined by Andrea Baldwin, FNP-C, on November 25, 2020, for dizziness. (Doc. 40-3 at pp. 18-24). Baldwin referred Hempen back to his neurologist, Dr. Kafaie, and to Dr. Mark Szewczyk, an otolaryngologist. (*Id.* at p. 28).

Around January 5, 2021, Hempen and another employee, Charles Koepke, had a meeting with Leonard, who had become Superintendent, regarding "SCBA testing." (Doc. 39-2 at p. 6). OSHA requires the City to have equipment for employees to use in case of a deadly chlorine gas leak; the equipment includes a SCBA mask so that employees breathe oxygen from tanks, not chlorine gas. (Doc. 39-3 at p. 4). The City purchased its SCBA equipment in 2008 and, as of 2021, had never used the equipment. (Doc. 39-2 at p. 9). Leonard had been going over OSHA rules and regulations, however, and realized they should be taking the SCBA test annually to prepare for a chlorine leak. (Doc. 39-2 at p. 7).

During the meeting, Leonard explained that EMTs would come in and conduct a physical. (Doc. 37-11 at p. 6). The employee would then put the SCBA mask on and walk around the plant while breathing oxygen for five minutes. (*Id.*). Afterward, the employee's blood pressure and pulse would be taken. (*Id.*). The SCBA mask was a full-face respirator mask. (*Id.*). Koepke testified that Hempen told Leonard he was going to refuse to take the test because he thought it was ridiculous. (*Id.*). Hempen testified that he told Leonard he could not take the test because he wears glasses, and the mask does not fit around glasses. (Doc. 39-1 at p. 15). Hempen said it would be ridiculous to even try. (*Id.*).

Koepke, the union steward for the Water Plant, said he would call the union to see what they had to say about it. (Doc. 37-11 at p. 6). A union representative said that Hempen had to take the test if it is an OSHA requirement, but that he could not be terminated for failing the test. (*Id.*). However, Hempen's refusal to take the test would be job subordination. (*Id.*). Hempen then told Leonard he would take the test, but he guaranteed he would fail it. (Doc. 39-1 at p. 15). Hempen could not remember what Leonard said in response because Leonard was "kind of upset about the whole thing by then." (Doc. 37-10 at p. 20).

Two days after this meeting, Hempen woke up feeling woozy but went to work at 6:30 a.m. anyway. (Doc. 39-5 at p. 3). When Koepke arrived at work, Hempen told him he was not feeling well but was going to try to stay until 10:30 a.m., which was half of his shift. (*Id.* at pp. 2-3). Hempen then left work around 10:30 a.m. (Doc. 37-11 at p. 8). Shortly thereafter, Leonard walked into the plant and asked where Hempen was; Koepke told him that Hempen went home. (*Id.* at p. 9). At 10:46 a.m., Leonard texted Hempen: "Hey Mike, start letting me know when you want off early… I know you told Chuck, but I had [no] clue you were leaving early… I asked Chuck where you went, I had [no] clue…" (Doc. 39-2 at p. 14). One minute later, Hempen responded: "Okay, sorry." (*Id.*). When Hempen got home, he laid down in a dark room for several hours. (Doc. 39-5 at p. 3).

Hempen was fired on January 10, 2021. (Doc. 37-6 at p. 2). The termination letter stated that on January 7, 2021, he left the Water Plant during his shift without notice to supervisory personnel, he did not return that day, he provided no reason for leaving, and he never explained why he left. (Doc. 37-2). The letter also referenced Hempen's "refusal to participate in OSHA-required SCBA safety suit air apparatus testing required of all water plant employees . . . ." (*Id.*).

At the time of his termination, Hempen was a member of the International Union of Operating Engineers Local #148 ("the Union"), which had entered a Collective Bargaining Agreement with the City. (Docs. 37-2, 37-3). The Collective Bargaining Agreement became effective in September 2020. (Doc. 37-3).

During the Union grievance process, a "Last Chance Agreement" was negotiated between Hempen, the Union, and the City, which would have allowed Hempen to return to work for the City. (Doc. 37-4). The Union signed the agreement, but the City and Hempen

did not. (*Id.*). On February 5, 2021, the Union sent an email to counsel for the City formally withdrawing the grievance because Hempen would not sign the Last Chance Agreement. (Doc. 37-5).

As a City employee, Hempen received an Employee Handbook that outlined the FMLA. (Doc. 37-9). The City also placed a poster on a bulletin board in the Water Department that described FMLA rights and responsibilities. (Doc. 37-7 at pp. 6-7; Doc. 37-8). Each year, the FMLA posters were replaced with the current version for that particular year. (Doc. 37-7 at p. 7). Hempen, however, did not pay attention to the posters. (Doc. 37-10 at p. 26). Hempen first heard the term "FMLA" in 2018 when his co-worker, Koepke, broke his ankle and used FMLA time. (*Id.* at pp. 26-27).

Theresa Kurwicki is the City Clerk of Nashville, and is responsible for the administration of the FMLA for the City. (Doc. 37-7 at p. 7). Kurwicki acknowledged that the City made no effort to offer Hempen intermittent FMLA leave or to determine whether he was qualified for intermittent FMLA leave from January 1, 2019, until his termination. (*Id.* at p. 6). She also admitted that the City's employee handbook did not say anything about an employee's ability to take leave intermittently, or in separate blocks of time. (*Id.* at p. 7). To get FMLA leave, employees had to tell Kurwicki that they were ill because she cannot "read their minds." (*Id.* at p. 6).

On August 4, 2021, Hempen filed a Charge with the Illinois Department of Human Rights alleging discrimination because of his age and disability under the ADA for failing to accommodate. (Doc. 37-6). He filed this action on December 20, 2022, alleging FMLA Interference (Count I) and FMLA Discrimination (Count II). (Doc. 1).

**LEGAL STANDARD**

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In determining whether a genuine issue of fact exists, the Court views the evidence and draws all reasonable inferences in favor of the non-moving party. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022). Once the moving party sets forth the basis for summary judgment, the burden shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323.

**DISCUSSION**

"The FMLA generally provides eligible employees suffering from a serious medical condition with as many as twelve weeks of unpaid leave during any twelve-month period." *Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012). An employer may not interfere with or retaliate against an employee's use or attempted use of FMLA leave. *Id.* The difference between an FMLA retaliation and an FMLA interference claim "is that a retaliation claim requires the employee to prove discriminatory or retaliatory intent while an interference claim only requires the employee to prove that the employer denied him entitlements provided by the Act." *Id.*

**I.    FMLA Interference**

A plaintiff claiming FMLA interference must demonstrate: "(i) the employee was eligible for FMLA protections; (ii) the employer was covered by the FMLA; (iii) the employee

was entitled to leave under the FMLA; and (iv) the employee provided sufficient notice of intent to take FMLA leave." *Ziccarelli v. Dart*, 35 F.4th 1079, 1084 (7th Cir. 2022). The plaintiff must also show that the employer denied or interfered with benefits to which he was entitled and the plaintiff was prejudiced as a result. *Id.* at 1089.

The City does not dispute that Hempen was eligible for FMLA protections or that it was subject to the FMLA, nor does it argue that Hempen cannot establish prejudice from Nashville's interference with his FMLA benefits. Instead, it asserts that Hempen was not entitled to take leave under the FMLA because he has not shown that he had a serious medical condition that rendered him unable to perform the functions of his job. The City further argues that it had no notice of Hempen's intent to take FMLA leave.

A. Entitlement to FMLA Leave

"An employee is entitled to leave under the FMLA if (1) she is afflicted with a 'serious health condition,' and (2) that condition renders her unable to perform the functions of her job." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (quoting *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 669 (7th Cir. 2011)). A "serious health condition" can include incapacity and treatment; pregnancy or prenatal care; chronic conditions; permanent or long-term conditions; or other conditions requiring multiple treatments. 29 C.F.R. § 825.115.

The City, focusing only on the first category—incapacity and treatment—contends that although Hempen claims to have suffered dizziness or vertigo on occasion, there is no evidence that he has ever been hospitalized for the condition or that he received continuing treatment by a healthcare provider. As Hempen argues, however, vertigo can constitute a chronic condition under the FMLA. A "chronic serious health condition" is one that

"(1) [r]equires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider; (2) [c]ontinues over an extended period of time (including recurring episodes of a single underlying condition); and (3) [m]ay cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." 29 C.F.R. § 825.115(c); *see also Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) ("Some serious health conditions may be chronic, causing episodic rather than a continuous incapacity.").

Here, Hempen began experiencing symptoms of vertigo after a head injury around 2008. He saw numerous doctors, received an MRI, and was finally diagnosed with Benign Paroxysmal Positional Vertigo on March 28, 2013. (Doc. 40-3). He was referred to an otolaryngologist and a neurologist, Dr. Jafar Kafaie, who told Hempen that no medication would cure his vertigo. (Doc. 39-1 at p. 5). Hempen continued to see doctors and had three visits in the four months prior to his termination. Hempen also testified that if he had a mild or moderate episode of vertigo, he would usually have one or two more episodes within a short period of time. (Doc. 37-10 at p. 8). But if he had a major episode, he could go six months to a year without having another one. (*Id.*).

Based on the hundreds of pages of medical records submitted by Hempen that span from 2010 to 2021 and his testimony regarding his periodic episodes of vertigo during which he is incapacitated, the Court finds that Hempen has presented evidence that he suffered from a chronic serious health condition as defined by the FMLA.

B. Notice of Intent to Take Leave

The City also asserts that Hempen never provided notice of his intent to take leave. "Typically, an employee must give notice of the need for FMLA leave at least 30 days in

advance but, if the need for leave is not known in advance, an employee may give notice 'as soon as practicable under the facts and circumstances of the particular case.'" *Guzman v. Brown Cnty.*, 884 F.3d 633, 639 (7th Cir. 2018) (quoting 29 C.F.R. § 825.303(a)). "The employee's primary duty in notifying his employer is to provide enough information to the employer 'to show that he *likely* has an FMLA-qualifying condition.'" *Pagel v. TIN Inc.*, 695 F.3d 622, 628 (7th Cir. 2012) (quoting *Burnett v. LFW Inc.*, 472 F.3d 471, 479 (7th Cir. 2006)).

"[A]n employee may be excused from expressing a need for medical leave in at least two exceptional situations—when circumstances provide the employer with sufficient notice of the need for medical leave or when the employee is incapable of providing such notice." *Burnett*, 472 F.3d at 479. "It is enough under the FMLA if the employer knows of the employee's need for leave; the employee need not mention the statute or demand its benefits." *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 726 (7th Cir. 2007) (quoting *Byrne v. Avon Products*, 328 F.3d 379 (7th Cir. 2003)). An employer may also acquire constructive notice of an employee's serious health condition requiring FMLA leave. *Guzman*, 884 F.3d at 639. "Clear abnormalities in an employee's behavior" can provide constructive notice to an employer of the need for FMLA leave. *Id.*

Here, the City argues that Hempen never requested relief under the FMLA, and it had no constructive notice of his need for FMLA leave. Nashville points to *Guzman*, where the Seventh Circuit Court of Appeals found that six incidents of oversleeping due to sleep apnea, spread out over 18 months, was not the kind of "stark and abrupt change" in an employee's behavior that would provide an employer with constructive notice of a serious health condition. *Id.* Like *Guzman*, Nashville contends, Hempen's occasional need to leave work because of vertigo and dizziness did not provide it with constructive notice of his serious

health condition.

In response, Hempen argues that the City had knowledge that he might be using sick time for an FMLA-qualified reason but failed to notify him of his right to intermittent leave under the FMLA. The Court agrees. There is some evidence that the City knew about Hempen's medical condition as early as 2016 or 2017. Hempen had an episode of vertigo within six to eight months after starting work at the Water Plant, and Leonard had to relieve him from his shift. (Doc. 39-1 at p. 8). Hempen provided evidence through his testimony and an affidavit that he told Leonard he had vertigo, that it comes and goes, and there is nothing he can do about it. (*Id.*).

Hempen's wife, Shari, also testified that she had more than one conversation about Hempen's vertigo and dizziness with Leonard. (Doc. 39-7 at p. 2). The first time Shari had to pick Hempen up at work because of his vertigo, she apologized to Leonard for Hempen vomiting in the trash can and explained his diagnosis. (*Id.*). Shari provided an affidavit stating that she spoke with Leonard about Hempen's vertigo and dizziness six to ten times, and she told Leonard that Hempen had to go to bed when he got these episodes. (Doc. 39-8). Leonard testified that he spoke to Shari when she picked Hempen up from work on that first occasion, but he does not remember what they spoke about. (Doc. 37-13 at p. 4). However, Leonard did recall Hempen being nauseated at work a couple of times, and he admitted that he, Middleton, and Koepke all asked Hempen if he had seen a doctor. (Doc. 39-2 at p. 10).

There is also evidence that the City knew of Hempen's condition after the Effingham work trip in 2019 and his episode at work in November 2020. Hempen testified that Middleton, the Superintendent, asked him how he was doing after the work trip and whether he had seen a doctor. (Doc. 39-5). Hempen told Middleton that he had seen many doctors,

that a physician told him the vertigo would come and go, and that it was something he would have to deal with. (*Id.*). Then, after the November 2020 incident, Middleton asked Hempen if he had ever gone to the doctor to figure out what was going on. (*Id.*). Furthermore, there is no dispute that despite the City's knowledge that Hempen needed sick time for an FMLA-qualified reason, it made no effort to offer Hempen intermittent FMLA leave or ensure he understood his rights under the FMLA. (Doc. 37-7 at p. 6).

Viewing these facts in a light most favorable to Hempen, a jury could find that the City had notice of Hempen's need for FMLA leave due to a chronic serious health condition, interfered with his right to take FMLA leave, and that Hempen was prejudiced as a result. Thus, Nashville is not entitled to summary judgment on Hempen's FMLA interference claim in Count I.

## II. FMLA Discrimination / Retaliation

Under 29 U.S.C. § 2615(a)(2), it is unlawful for an employer to retaliate against an employee who exercises or attempts to exercise FMLA rights. "In other words, the employer cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." *Pagel*, 695 F.3d at 631.

To establish FMLA discrimination or retaliation, "a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two." *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017). "To succeed on a retaliation claim, the plaintiff does not need to prove that retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (quotation omitted).

The Seventh Circuit recognizes two frameworks for showing discrimination. *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). Under the holistic approach that the Court of Appeals established in *Ortiz v. Werner Enterprises, Inc.*, a court must look at the evidence as a whole to determine whether it permits an inference of prohibited discrimination. *Id.* (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 762 (7th Cir. 2016)). Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must first establish a prima facie case for discrimination. *Id.* If the plaintiff presents evidence that he was meeting the employer's performance expectations, then the burden shifts to the employer to present a "legitimate, non-discriminatory reason" for the employment decision. *Id.* (citing *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 574 (7th Cir. 2021)). If the employer presents a legitimate reason, the burden shifts back to the employee to show the proffered reason is a pretext for discrimination. *Id.* In other words, "[t]he defense bears the burden of articulating the justification, but the plaintiff bears the burden of showing that the justification is a pretext." *Id.* (quoting *Sterlinski v. Catholic Bishop of Chicago*, 934 F.3d 568, 571 (7th Cir. 2019)). "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008) (citation omitted).

A court "may skip the *McDonnell Douglas* prima facie analysis if the employer raises the employee's performance as the reason for the adverse employment decision." *Vichio*, 88 F.4th at 691 (citing *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023)). "In such a case, issues of satisfactory performance and pretext overlap," allowing the court to move directly to pretext. *Id.* "Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision." *Id.* (quoting *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000)).

Here, because Nashville has raised Hempen's work performance as the reason for his termination, the Court need not consider whether Hempen has set forth a prima facie case for FMLA discrimination or separately analyze the two frameworks. *See id.* Instead, the Court need only determine whether Hempen has presented sufficient evidence that would allow a reasonable jury to find that the City engaged in FMLA discrimination.

The City asserts that Hempen was fired because he expressed his refusal to participate in the SCBA testing, and because he left the Water Plant on January 7, 2021, without permission or advising a supervisor. Leonard testified that, at the time Hempen was fired, they had a Collective Bargaining Agreement with the Union, and the City had instructed him to "tighten up all restrictions and rules with the Nashville water plant." (Doc. 37-13 at p. 10). Between Hempen's refusal to take the SCBA test on January 5, 2021, and his leaving work early without notifying or receiving approval from a supervisor on January 7, 2021, Leonard believed that termination was required. (*Id.*). Indeed, Hempen's termination letter cites the Collective Bargaining Agreement's provision requiring immediate discharge for offenses including "conduct which causes the public to lose confidence in the City's ability to provide services, including, but not limited to, threatening the quality of the water supply, the uninterrupted delivery of services, or any action which could reasonably be interpreted by the citizens as endangering the safety of the citizens." (Doc. 37-2).

Hempen has produced no evidence that these reasons are pretextual. While he refers to another employee who left the Water Plant without permission and only received a write-up, there was no Collective Bargaining Agreement in place at that time. Hempen also references a time when Leonard allowed Koepke to use three sick days as vacation time, but since he wasn't actually sick, "the leave could not have been approved." But regardless of

how the leave time was structured, Koepke informed Leonard that he would not be at work. Hempen did not. Finally, Hempen argues that he also left work on November 19, 2020, without notifying a supervisor, but he was not fired at that time. Leonard testified, however, that it was the combination of Hempen's expressed refusal to do the SCBA test along with leaving work without notifying a supervisor that led to his termination.

In sum, Hempen has failed to meet his burden of proving that the proffered reasons for his termination were pretextual. Because Hempen has not produced evidence that would allow a reasonable jury to find that the City engaged in FMLA discrimination or retaliation, the City is entitled to summary judgment on Count II.

## Conclusion

For these reasons, the Motion for Summary Judgment filed by Defendant City of Nashville, Illinois (Doc. 37) is **GRANTED in part and DENIED in part**. Plaintiff Michael Hempen's claim of FMLA Discrimination in Count II is **DISMISSED**.

A status conference will be set by separate order to set a firm trial date on Hempen's claim in Count I for FMLA Interference.

**IT IS SO ORDERED.**

DATED:   February 24, 2025

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**